***********
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Stephenson and the briefs and arguments of the parties. The appealing parties have not shown good ground to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 ***********
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by the parties as:
 STIPULATIONS
1. The parties are subject to the Workers' Compensation Act;
2. Plaintiff allegedly sustained an injury on or about July 19, 2002;
3. Plaintiff's average weekly wage is the maximum rate for 2002, which yields a compensation rate of $654.00 a week;
4. Plaintiff last worked for defendant-employer on August 19, 2002;
5. During the year following plaintiff's injury, plaintiff received $19,178.56 in accident and sickness disability benefits;
6. Plaintiff's accident and sickness disability benefits were paid pursuant to a 100% employer funded disability plan.
 ***********
Based upon all of the competent evidence in the record, the undersigned makes the following:
 FINDINGS OF FACT
1. On the date of hearing before the Deputy Commissioner, plaintiff had been employed by defendant Goodyear Tire Rubber in their Kelly Springfield tire plant for over 27 years. Plaintiff was born on January 10, 1949 and was 55 years old.
2. In approximately 1981 plaintiff became an R-1 Tire Builder at the Kelly Springfield plant. The position involves manually putting tires together from various components: lines, beads and inner liner. The inner liner comes on a heavy roll that weighs 100-125 pounds. This role must be manually replaced by the employee every 25 to 30 tires produced, which requires heavy lifting.
3. Plaintiff worked 48 hours per week in the R-1 Tire Builder position and he received a production bonus over 90% of the time he worked for producing more tires than the required base number.
4. Plaintiff previously had lumbar problems in 1985, which eventually resulted in a bilateral lumbar laminectomy with excision of herniated nucleus pulposus at L-4, 5 and L-5, S-1, with posterior lumbar interbody fusion at L-4, 5 and L-5, S-1. He successfully returned to work after these procedures.
5. Plaintiff previously had injured his neck working for defendant in August of 1997 while he was building tires, something popped in his neck and a sensation was felt in his right hand. Plaintiff received about six months of therapy but continued to work during this time and eventually his injury improved. He has worked in his position as a Tire Builder since that time.
6. Medical Records indicated that plaintiff received chiropractic therapy at Schultz Chiropractic Center from August 19, 1997 through October 6, 1997. An MRI of the cervical spine taken on September 23, 1997 revealed that plaintiff had mild disc degenerative changes at the C5-C6 and C6-C7 without evidence for frank disc protrusion.
7. Plaintiff received neurological consultation for his neck problem at Fayetteville Neurological Clinic on October 7, 1997, and was referred for a surgical consult after review of the MRI results.
8. Plaintiff visited Dr. Bruce Jaufmann at Carolina Neurosurgical Services on November 4, 1997. Dr. Jaufmann noted that review of the MRI shows degenerative disc disease at C5-6 and C6-7 without evidence of disc herniation; he further opined that Mr. Bryant had a cervical radiculopathy which is improving significantly. Plaintiff returned to Dr. Bruce Jaufmann on January 8, 1998 and it was noted that he was doing extremely well and had improved dramatically since his last visit. Although plaintiff was recommended for a sixth month follow-up, it was not needed.
9. On April 8, 2002 plaintiff was involved in a motor vehicle accident. After initially receiving treatment at an emergency room he visited Valley Chiropractic Group with headaches, neck and back pain and he treated there from April 15, 2002 through June 6, 2002. Plaintiff missed some time from work after the April 8, 2002 motor vehicle accident but was released back to work full duty on May 30, 2002 by Daniel J. Culliton, DC after plaintiff's symptoms had improved.
10. Following the April 8, 2002 motor vehicle accident plaintiff also treated for neck pain at Carolina Primary Care on April 22, 2002, May 6, 2002, May 22, 2002 and June 5, 2002.
11. Plaintiff was in a second motor vehicle accident on May 29, 2002 that just put a dent in his bumper and he was not injured. Plaintiff returned to work as an R-1 Tire Builder on June 1, 2002 and stated that his neck did not hurt him.
12. The Valley Chiropractic Group medical record from June 4, 2002 indicated that plaintiff had worked two days last week and did not have a significant increase in pain.
13. When asked to describe at the hearing before the deputy commissioner what and how he was injured at work, plaintiff stated,
 "I had changed the roller liner. I had run out, you know. When I run out, I went around and picked the roll of liner. It was pretty big; it was a little bigger than normal, some of them are smaller. And I picked — it's stuck on a rod and I picked it off the rod, put the weight in my arms and turned to put it on the machine and it slipped out of my right hand and I grabbed it and it just popped right here and went all the way to my hand. That roll, it was over 100 pounds, 125 pounds."
14. Plaintiff described the injury's location "where it popped right here" as "kind of like a popping sensation in my eardrums. And then it went all the way down my arm to my fingers." The hearing transcript shows that he was pointing to an area at the back of his head at the base of his skull approximately in the center and that he was referring to pain all the way down his right arm.
15. Plaintiff figured his neck injury would go away because he did injure his neck before in 1997 and he worked it out. However, with this injury of July 19, 2002 he went home the next day, Saturday, July 20, 2002, and the discomfort got worse. Since the injury continued to worsen on the next day, July 21, 2002, he went to the chiropractor on Monday, July 22, 2002, who told him he needed to see a medical doctor.
16. The medical note from plaintiff's Monday, July 22, 2002 visit at Valley Chiropractic Group indicates, "patient was pulling ______ (?) on a tire at work and had a sharp pain in CSP (cervical spine) down RUL (?). Heard popping noise acc (accident) 7-19-02 relates a liner slipped 125 lbs. from hand that started pain instantly."
17. Before plaintiff went to the chiropractor on Monday, July 22, 2002, he notified his employer of his injury by calling Clifton Moody. Plaintiff did not go into work that day.
18. Clifton Moody was the Area Manager for plaintiff and was plaintiff's direct supervisor. His understanding as to Mr. Bryant's absence on July 22nd was, "we come into work we check out our report-offs and Bruford reported of a big tire-aggravated injury. That's it." Mr. Moody described an automated report off system where employees leave messages explaining their absence.
19. Mr. Moody attempted to call on July 25, 2002 as plaintiff left a message that he had hurt himself with a roll of interliner and would be absent. Mr. Moody did not speak to plaintiff until he returned to work in the light duty capacity on August 6, 2002.
20. However, an incident report was not filled out by Mr. Moody and plaintiff until October 17, 2003.
21. As an explanation as to why an incident report was not filled out until October 17, 2003, Mr. Moody testified that he thought plaintiff's condition was from the car accident and the big tire plaintiff was building at the time and furthermore that plaintiff did not say anything about being hurt or getting hurt or dropping a roll of liner or anything on the report off system.
22. Another explanation Clifton Moody gave for the delay in the incident report was that he was sick and not at work on August 6, 2002 when plaintiff saw the company nurse, reported to her how he got hurt and came back to work on light duty.
23. Plaintiff stated that he repeatedly told his employers of the incident but they did not allow him to file an incident report and it was not until he hired a lawyer that they completed the incident report.
24. The company nurse's portion of the incident report refers to an August 6, 2002 dispensary report when plaintiff again reported his injury to the employer. The dispensary report states, "patient thinks this is not from car accident thinks it is from building tires + many years. Roll of rubber fell July 20, 2002, at that time he felt neck pain again . . ."
25. The medical note from plaintiff's Tuesday, July 23, 2002 visit to Carolina Primary Care indicated, "got over the MVA (motor vehicle accident) [May 29, 2002] and went back to work June 30th + last Friday he lifted 125#s tripped + slipped + felt pain on right side neck going down to shoulder, positive numbness, 7-8/10 (pain), now getting slight better."
26. However, despite this medical note indicating he didn't return to work until June 30, 2002, plaintiff had gone back to work on June 1, 2002 and worked until July 19th. Plaintiff indicated he went back to work because he felt better and he wanted to work, and he was having no problems.
27. Plaintiff stated that July 19, 2002 was the day he picked the roller rubber up and experienced a pop and pain shot down his arm; since that day, it has not gone away; that he has been operated on which helped him a little bit but the pain has not gone away completely.
28. After returning to light duty work on August 8, 2002 under a 20 pound lifting restriction, plaintiff reported that he was put to work doing painting and pulling, repairing sidewall which hurt him as bad as building tires, so bad that he was vomiting at night and needed to see someone about it.
29. Plaintiff's last day of work for defendant was August 19, 2002.
30. Medical records show that plaintiff returned to Carolina Primary Care on August 20, 2002, for neck pain where he saw Dr. Valeria Ainolhayat; he was given an excuse from work and was referred to see Dr. Bruce Jaufmann, a neurosurgeon.
31. Medical records show that following August 19, 2002, plaintiff sought treatment for his neck condition at Carolina Neurosurgical Services, P.A. under the care of Dr. Bruce Jaufmann on September 06, 2002. An MRI was performed on September 17, 2002 and a cervical myelogram performed on October 22, 2002, it was Dr. Jaufmann's impression that plaintiff's diagnosis was cervical radiculopathy. Dr. Jaufmann noted on the December 12, 2002 visit that review of a cervical MRI showed discogenic changes with very mild osteophytic spurring, at C5-6 there is a very mild effacement of the ventral thecal sac but no definite disk herniation or definite nerve impingement. Dr. Jaufmann opined that plaintiff was not a surgical candidate and that he felt conservative treatment methods should be initiated. Plaintiff desired a second opinion from Dr. Allen.
32. Plaintiff saw Dr. Robert Allen of the Raleigh Neurosurgical Clinic on December 18, 2002 who diagnosed a right C7 cervical radiculopathy and opined that surgical treatment may be of benefit. Plaintiff eventually had surgery by Dr. Allen, he underwent right sided C5-6 and C6-7 foraminotomies on February 21, 2003. In spite of the surgery, plaintiff continued to experience severe radiculopathic pain into his arm whereupon Dr. Allen eventually recommended a two level anterior diskectomy and fusion at C5-6 and C6-7, which occurred at — plaintiff's last visit with Dr. Allen on July 23, 2003.
33. Plaintiff saw Dr. Paul Suh of the North Carolina Spine Center for a second opinion as to the fusion surgery on September 16, 2003. As did Dr. Allen, Dr. Suh opined that plaintiff would benefit from an anterior cervical decompression, stabilization and fusion at C5-6 and C6-7. Dr. Suh performed this operation October 2, 2003; the surgery improved plaintiff's symptoms although they were not completely resolved.
34. Daniel J. Culliton, DC, a chiropractor at Valley Chiropractic Group, was deposed on August 5, 2004. He reviewed his medical notes and summarized his findings and the treatment he performed on plaintiff. Of note, Dr. Culliton testified, in an expert medical opinion deemed herein to be credible and accepted as fact, that it was his opinion that the work injury reported to him by plaintiff on July 22, 2002 aggravated plaintiff's condition after the motor vehicle accident, an "exacerbation of these injuries or of some nature".
35. Dr. Culliton stated that plaintiff came in with a significant degenerative problem with his neck to begin with, so every time he has a trauma, he certainly is predisposed and has greater potential to have not only increased symptoms, but an acceleration of degeneration.
36. Dr. Valeria Ainolhayat, plaintiff's primary care doctor, was deposed on September 16, 2004. She also reviewed her medical notes and summarized her findings and the treatment she performed on plaintiff. Of note, Dr. Ainolhyat was unable to determine whether any one of the three incidents which occurred to plaintiff, the two motor vehicle accidents and the alleged work injury, may have made a difference in plaintiff's symptomology because she did not see him after the two motor vehicle accidents as he was seen by Dr. Campbell. She did state that lifting a heavy tire would indeed exacerbate the pain. Dr. Ainolhyat also stated that it was her opinion to a reasonable degree of medical certainty that the alleged injury explained to her would accelerate the need for the medical treatment that was received by plaintiff, and that such an injury can exacerbate the pain.
37. Dr. Paul Suh, an orthopaedic surgeon specializing in spinal disorders, was deposed on September 28, 2004. He reviewed his medical notes and summarized his findings and the treatment he performed on plaintiff. Of note, Dr. Suh stated that it was his opinion to a reasonable degree of medical certainty that the incident occurring July 19, 2002 was one of a list of incidences that contributed to Mr. Bryant's overall condition, and the composite or totality of all his conditions in his neck led to the necessity for surgery. He went on to state that the July 19, 2002 incident was an aggravating or exacerbating factor leading to the medical treatment that plaintiff received therefrom.
38. Dr. Suh also found that plaintiff has reached maximum medical improvement from the surgery he performed, he would assess a 15 to 20 percent permanent partial disability rating to the neck and that plaintiff should have a permanent lifting restriction of no more than 30-50 pounds.
39. Dr. Robert L. Allen, neurosurgeon, was deposed on November 10, 2004. He reviewed his medical notes and summarized his findings and the treatment he performed on plaintiff. Of note, when asked to a reasonable degree of medical certainty whether the July 19, 2002 incident more likely than not was the aggravation that made the radiculopathy such that it required surgery, Dr. Allen stated that it is very likely. He further explained the actual physiology of how this could happen.
40. Plaintiff suffered an injury by accident on July 19, 2002 that aggravated his pre-existing degenerative disc disease and, as a result, plaintiff was unable to earn the same or greater wages in the same or any other employment from August 20, 2002 and continuing.
 ***********
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. On July 19, 2002 plaintiff sustained a compensable injury by accident arising out of and in the course of his employment with defendant. As result of this injury by accident a pre-existing condition was aggravated or exacerbated. N.C. Gen. Stat. § 97-2(6).
2. As result of his compensable injury by accident on July 19, 2002, plaintiff is entitled to receive total disability compensation from August 20, 2002 through the present and continuing. N.C. Gen. Stat. § 27-29.
3. Plaintiff was entitled to receive all medical treatment for his neck provided by his treating physicians, including the two surgeries plaintiff underwent. N.C. Gen. Stat. §§ 97-2(19), 97-25, 97-25.1.
 ***********
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to a reasonable attorney's fee awarded in paragraph 3, defendants shall pay to plaintiff total disability compensation at the weekly rate of $654.00 from August 20, 2002 until the present and continuing until plaintiff returns to suitable employment or the Industrial Commission Orders otherwise. Said amount shall be paid in a lump sum and defendants are entitled to a credit for the amount of disability monies that plaintiff has heretofore received, $19,178.56.
2. Defendants are to pay for all medical expenses resulting from plaintiff's compensable injury by accident on July 19, 2002 and for the treatment of the aggravation or exacerbation of a pre-existing condition as result of a compensable injury by accident.
3. A reasonable attorney's fee of twenty-five percent (25%) of the compensation awarded plaintiff in paragraph 1 is hereby approved.
4. Defendants shall pay the costs.
This the 27th day of October 2005.
 S/_______________ DIANNE C. SELLERS COMMISSIONER
CONCURRING:
 S/___________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________ LAURA K. MAVRETIC COMMISSIONER